Rockingham, }
Jan. 1, 1918. }

THOMAS H. SIMES, *Trustee*, *v.* ANNIE P. WARD *& a.*

Devise in trust, and, on termination thereof, "to my heirs": by this term the testator presumably intended those who were his heirs upon his decease and not upon the termination of the trust.

An administrator or a guardian should compromise a claim against the estate, when such course is reasonable.

PETITION, for advice, by the trustee under the will of Albert L. Jones. Albert died childless in 1870 leaving a widow Mary W., a brother William, a sister Anne, a sister Emily, and seven nephews and nieces, children of his deceased sisters Susan and Elizabeth.

By the second clause of his will he gave the use and income of all his estate to his wife for life; by the third, the remainder to his children if they survived his wife; by the fourth he provided that "in case no lineal descendants of me should survive my said wife then in her decease I give, bequeath and devise all my said property that may then remain to my sisters Mary R. and Emily F. Jones for and during their lives and the life of the survivor using and enjoying the profits thereof and such part (if any) of the principal as their comfort may require and on the decease of the survivor of them to my heirs"; and by the fifth clause he nominated his wife, Mary, as executrix. She accepted the trust and qualified with a bond signed by William as surety. William died in 1872 and Mark H. Wentworth was appointed to administer his estate. Mary resigned as executrix in 1874. James W. Emery was appointed in her place and called on her and the sureties on her bond to make good $100,000 which she had lost. William's administrator, widow and children compromised the claim by assigning all their interest in Albert's estate to Emery, to be held in trust for the benefit of the life tenants and the other remaindermen. The assignment was executed by Wentworth, William's widow, his children who were of age and by the guardians of those who were minors. The property so assigned was of less value than Emery's claim against William's estate. The life tenants are dead. The prayer of the petition is for advice as to who are entitled to the property in the trustee's hands.

Transferred by *Sawyer*, J., without a ruling from the May term, 1917, of the superior court.

*Thomas H. Simes, pro se.*

*Grant M. Palmer, Ira H. Ellis, Barton Corneau, Clarence L. Newton, Woodward Emery* (all of Massachusetts) and *Albert R. Hatch* (*Mr. Palmer, Mr. Corneau* and *Mr. Newton* orally), for the defendants.

YOUNG, J. The questions considered are (1) whether the persons Albert had in mind when he used the term "my heirs" were those who answered to that description when he died or those who answered to it when the trust terminated; and (2) whether the compromise agreement is legal.

1. If the words "my heirs" are given their ordinary meaning, Albert intended to give whatever might remain of his estate on the termination of the trust to those who would have succeeded to it, if he had died intestate as to that part of his estate. This seems to be conceded, but some of the defendants contend that, when the will is read in the light of the surrounding circumstances, it is more probable than otherwise that the persons Albert had in mind were those who would answer to the description of his heirs on the termination of the trust. That is, they contend that it follows from the fact his estate was not to be distributed until the termination of the trust, that he must have had those in mind, when he used the term "my heirs," who would take the funds when the trust terminated. The facts on which they base this contention are that by the second clause of his will he gave his wife the use and income of his estate for life with power to use the principal and by the third clause whatever remained at her death to his lineal descendants, while by the fourth clause he provided that if no descendants of his survived his wife, his sisters Mary R. and Emily should have the use of his property for their lives and that whatever remained on the death of the survivor should go to his heirs.

These provisions, however, have little if any tendency to sustain the contention that Albert had a particular class of persons in mind when he used the term "my heirs." They tend rather to the conclusion that the only persons in whom he was especially interested were his wife and children and two of his sisters. These provisions, therefore, tend rather to rebut than to sustain the contention that the persons Albert had in mind were those who would answer to the description of his heirs at the time the trust terminated, for it is at least as probable that he had no one in particular in mind as it is that he had those in mind who would be his heirs when the trust terminated. In other words, the fact he named certain persons who were to take part of his property and gave the remainder to his heirs generally, tends rather to the conclusion that he was indifferent

as to the individuals who were to take it, than to the conclusion, that he had definite individuals or a definite class of individuals in mind. If, therefore, it is assumed that Albert gave the matter any thought, it is at least as probable that those he had in mind by the term "my heirs" were those who would answer that description at the time of his death as that it was those who would answer to it on the termination of the trust; for saying, I give a part of my estate to my heirs, is but another way of saying that as to that part of my estate I elect to die intestate. In short, if these provisions of the will have any tendency to sustain the contention that by "my heirs" Albert intended those who would be his heirs on the termination of the trust, that tendency is not strong enough to rebut the presumption that he intended to give those words their ordinary meaning.

2. An administrator or a guardian should compromise a claim against the estate when that is the reasonable thing to do. *Torrey* v. *Black*, 58 N. Y. 185, 189; Croswell, Ex'rs & Adm'rs, s. 433; 21 Cyc. 74, 79.

The compromise, therefore, which William's representatives made with Emery is valid if it was beneficial to the minors. *Wyman's Appeal*, 13 N. H. 19. Although it is true that the question of whether the agreement was beneficial to the minors is one of fact, it does not necessarily follow that this is the end of the case; for it is also true that the question of whether there is any evidence from which any other finding can be made is one of law. *Mitchell* v. *Railroad*, 68 N. H. 96, 117.

The only facts in the record relevant to the issue whether the compromise was beneficial to the minors are that the loss Albert's estate had sustained was very much larger than William's interest in that estate, that Mary could not, and that William's estate could, make this loss good. It is obvious the only conclusion that can fairly be drawn from these facts is that the settlement was for the benefit of every one interested in William's estate. Since this is so, the compromise agreement is valid whether it is to be considered as made by William's administrator or by the guardian of his minors and the others interested in his estate. It follows that William's legal representatives, as such, have no interest in the funds in the trustee's hands, and he is advised to divide the trust estate into forty parts and give ten parts to Anne's legal representatives, ten to Emily's legal representatives, five to each of Susan's children, or to his or her legal representative, and two to each of Elizabeth's children, or his or her legal representative.

*Case discharged.*

All concurred.